**SAXTON & STUMP LLC**
Joshua Voss, Esq.
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
(717) 556-1072

**STARK & STARK, P.C.**
A Professional Corporation
Marshall T. Kizner, Esq.
Joseph H. Lemkin, Esq.
100 American Metro Boulevard
Hamilton, NJ 08619-2319
(609) 791-7022
*Attorneys for Prestige*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | : |
|  | : |
|  | : Chapter 11 |
| Daryl Fred Heller, | : |
|  | : Case No. 25-11354 (JNP) |
| Debtor. | : |
|  | : |
|  | : |
| ---------------------------------------------------------- : |
| PRESTIGE FUND A, LLC; | : |
| PRESTIGE FUND A II, LLC; | : |
| PRESTIGE FUND A IV, LLC; | : Adv. Proc. No.: _____ |
| PRESTIGE FUND A V, LLC; | : |
| PRESTIGE FUND A VI, LLC; | : |
| PRESTIGE FUND A VII, LLC; | : |
| PRESTIGE FUND A IX, LLC; | : |
| PRESTIGE FUND B, LLC; | : |
| PRESTIGE FUND B II, LLC; | : |
| PRESTIGE FUND B IV, LLC; | : |
| PRESTIGE FUND B V, LLC; | : |
| PRESTIGE FUND B VI, LLC; | : |
| PRESTIGE FUND B VII, LLC; | : |
| PRESTIGE FUND B BTM I, LLC; | : |
| PRESTIGE FUND D, LLC; | : |
| PRESTIGE FUND D III, LLC; | : |
| PRESTIGE FUND D IV, LLC; | : |
| PRESTIGE FUND D V, LLC; | : |
| PRESTIGE FUND D VI, LLC; | : |
| PRESTIGE FUND D BTM I, LLC; | : |
| WF VELOCITY I, LLC; | : |



WF VELOCITY FUND IV, LLC;                                :
WF VELOCITY FUND V, LLC;                                 :
WF VELOCITY FUND VI, LLC; and                            :
WF VELOCITY FUND VII, LLC,                               :
                                                         :
                              Plaintiffs,                :
v.                                                       :
                                                         :
DARYL FRED HELLER,                                       :
                                                         :
                              Defendant.                 :
                                                         :
                                                         :

## **COMPLAINT**

Prestige Fund A, LLC; Prestige Fund A II, LLC; Prestige Fund A IV, LLC; Prestige Fund

A V, LLC; Prestige Fund A VI, LLC; Prestige Fund A VII, LLC; Prestige Fund A IX, LLC;

Prestige Fund B, LLC; Prestige Fund B II, LLC; Prestige Fund B IV, LLC; Prestige Fund B V,

LLC; Prestige Fund B VI, LLC; Prestige Fund B VII, LLC; Prestige Fund B BTM I, LLC;

Prestige Fund D, LLC; Prestige Fund D III, LLC; Prestige Fund D IV, LLC; Prestige Fund D V,

LLC; Prestige Fund D VI, LLC; Prestige Fund D BTM I, LLC; WF Velocity I, LLC;

WF Velocity Fund IV, LLC; WF Velocity Fund V, LLC; WF Velocity Fund VI, LLC; and WF

Velocity Fund VII, LLC (collectively, the "Funds" and each a "Plaintiff") by and through their

undersigned counsel, hereby file this complaint against Darry Fred Heller (the "Debtor" or

"Defendant") to determine the dischargeability of certain debts owed by Debtor to each of the

Funds and respectfully state as follows:

## **PRELIMINARY STATEMENT**

1.      Debtor instituted a widescale fraudulent scheme for the sale and operation of

automated teller machines units and Bitcoin ATMs (collectively, "ATMs") owned by the Funds.



4914-8788-2307, v. 1

2. The Funds are separate LLCs comprising approximately 2,700 investors who invested hundreds of millions in Debtor's scheme for the purchase and operation of well-over 30,000 ATMs.

3. Debtor made countless fraudulent representations to the Funds and their investors regarding the ATMs purchased, the operation of those ATMs, the viability of the Funds' investments, and the profits being earned.

4. Because of and in reliance on Debtor's fraudulent representations about the business scheme, the Funds entered into ATM Management Services Agreements ("MSAs") with Paramount Management Group, LLC ("Paramount"), under which Paramount initially received all revenues generated from the ATMs to cover operational costs and then certain monthly revenues were remitted to the Funds.

5. Paramount ceased making its required monthly payments to the Funds in April 2024, so the Funds brought suit against Paramount for breach of the MSAs a few months later. *See Prestige Fund A, LLC, et al. v. Paramount Mgmt. Group*, LLC, No. CI-24-06012 (C.P. Lancaster) ("Paramount Action").

6. The Paramount Action ultimately resulted in a November 21, 2024 Consent Judgment against Paramount in the amount of $138,156,118.38, which also required Paramount to provide an inventory and rights and title to the ATMs the Funds owned.

7. When Paramount did not comply with that Consent Judgment, contempt proceedings finally revealed Debtor's fraud.

8. As the Funds learned through the Paramount Action, the ATMs Debtor represented that he bought for the Funds either (1) never existed, (2) were purchased but stayed in a warehouse, (3) were sold to more than one entity, and/or (4) were not bought outright.



3

9.      Despite leaving the Funds with worthless investments and far less ATMsassets than promised, Debtor was not done defrauding the Funds. In the weeks after the Consent Judgment, Debtor transferred money from Paramount to Heller Capital with the intent to defraud the Funds of the money they are owed under the Consent Judgment.

10.      The Funds now seek a nondischargeable judgment for Debtor's years of fraudulent scheming and stolen investments, his willful and malicious conduct, and Debtor's most recent attempts to defraud the Funds by transferring money to which they are entitled.

<u>**PARTIES**</u>

11.      Plaintiff Prestige Fund A, LLC is a limited liability company organized under the laws of Pennsylvania.

12.      Plaintiff Prestige Fund A II, LLC is a limited liability company organized under the laws of Pennsylvania.

13.      Plaintiff Prestige Fund A IV, LLC is a limited liability company organized under the laws of Delaware.

14.      Plaintiff Prestige Fund A V, LLC is a limited liability company organized under the laws of Delaware.

15.      Plaintiff Prestige Fund A VI, LLC is a limited liability company organized under the laws of Delaware.

16.      Plaintiff Prestige Fund A VII, LLC is a limited liability company organized under the laws of Delaware.

17.      Plaintiff Prestige Fund A IX, LLC is a limited liability company organized under the laws of Delaware.

18.      Plaintiff Prestige Fund B, LLC is a limited liability company organized under the laws of Delaware.



19.     Plaintiff Prestige Fund B II, LLC is a limited liability company organized under the laws of Delaware.

20.     Plaintiff Prestige Fund B IV, LLC is a limited liability company organized under the laws of Delaware.

21.     Plaintiff Prestige Fund B V, LLC is a limited liability company organized under the laws of Delaware.

22.     Plaintiff Prestige Fund B VI, LLC is a limited liability company organized under the laws of Delaware.

23.     Plaintiff Prestige Fund B VII, LLC is a limited liability company organized under the laws of Delaware.

24.     Plaintiff Prestige Fund B BTM I, LLC is a limited liability company organized under the laws of Delaware.

25.     Plaintiff Prestige Fund D, LLC is a limited liability company organized under the laws of Delaware.

26.     Plaintiff Prestige Fund D III, LLC is a limited liability company organized under the laws of Delaware.

27.     Plaintiff Prestige Fund D IV, LLC is a limited liability company organized under the laws of Delaware.

28.     Plaintiff Prestige Fund D V, LLC is a limited liability company organized under the laws of Delaware.

29.     Plaintiff Prestige Fund D VI, LLC is a limited liability company organized under the laws of Delaware.



4914-8788-2307, v. 1

30.     Plaintiff Prestige Fund D BTM I, LLC is a limited liability company organized under the laws of Delaware.

31.     Plaintiff WF Velocity I, LLC is a limited liability company organized under the laws of Delaware.

32.     Plaintiff WF Velocity Fund IV, LLC is a limited liability company organized under the laws of Delaware.

33.     Plaintiff WF Velocity Fund V, LLC is a limited liability company organized under the laws of Delaware.

34.     Plaintiff WF Velocity Fund VI, LLC is a limited liability company organized under the laws of Delaware.

35.     Plaintiff WF Velocity Fund VII, LLC is a limited liability company organized under the laws of Delaware.

36.     Debtor, Daryl Heller, is an adult individual and businessman who resides and conducts business in Lancaster County, Pennsylvania and is the Debtor. Debtor is the CEO of Heller Capital Group, LLC a limited liability company, with an office located at 415 North Prince Street, Suite 202, Lancaster, PA 17603.

37.     Upon information and belief, Heller Capital is at least the majority member of Paramount, and, potentially, the sole member of Paramount.

38.     On February 10, 2025, Defendant filed a voluntary petition (the "Chapter 11 Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States District Court for the District of New Jersey (the "Court").

39.     The Funds are creditors of the Defendant as reflected in duly filed proofs of claim filed in Defendant's bankruptcy case.



6

### JURISDICTION AND VENUE

40.     The matters set forth herein are alleged upon information and belief.

41.     Each of the matters and allegations set forth herein are made on behalf of each

Plaintiff.

42.     This is an adversary proceeding commenced pursuant to Rules 7001 and 7003 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to determine the

dischargeability of certain debts under Section 523(a) of the Bankruptcy Code, owed by

Defendant to the Funds as a result of Defendant's conduct associated with solicitation of

investments, misappropriate of the Funds' property, and other willful and malicious conduct.

43.     This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(I).

44.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1334(b)

and 28 U.S.C. Section 157.

45.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1409.

### FACTUAL BACKGROUND

**A.     Debtor's business pitch**

46.     Debtor began his business in the ATM marketplace over a decade ago.

47.     Later, Debtor began pitching ATM investments to the Funds' investors.

48.     As set forth in his promotional materials for the investment, Debtor represented

himself as an "entrepreneur, founding more than twelve companies within the telecom,

technology, agriculture, real estate and energy sectors."

49.     He also held himself out as having been in the "ATM space" since February 2011

and having a background and strategy to generate revenue through "monetization of ATMs with

advertising revenue streams into the future."

50.     Debtor described the "ATM model" as such:



4914-8788-2307, v. 1

> Our Core strategy is to participate in a mature and stable ATM space that has historical strong operating margins. This is done by accessing attractive real estate locations for ATMs that are strategically positioned for capitalizing next generation revenue opportunity, augmenting current and healthy surcharge operating margins through an enhanced monetization strategy.

51.      Debtor further represented that, under this model, each Fund would own a portfolio of ATM assets and the management company, Paramount, would "source lucrative contracts with location owners" to place the ATMs and operate and service the ATMs.

52.      In turn, the portfolio of ATMs placed by Paramount would be aggregated to "normalize the return for investors," and keep "monthly payment consistent."

53.      As Debtor further represented to the Funds and the Funds' investors, the ATMs would be placed at "small chain convenience stores and retail stores, bodega and sundry shops (deli/grocery stores in metro markets), malls and travel plazas."

54.      In other words, Debtor represented the business plan as follows: the Funds would own ATMs purchased with their investment money, the management company (Paramount) would place those ATMs and service them, the ATMs would generate revenue when used, and the Funds would receive a monthly return on the investment from the portfolio of ATMs.

55.      Debtor represented the investment would generate monthly returns over the life of the investment.

56.      Debtor made further representations about the viability of the investment in Q&A sections of the investment summary promotional materials.

57.      Debtor represented that his management company, Paramount, committed to each investor the projected return each month based on a blended performance of the entire fund and, "in the rare occasion that the fund performance is lagging, management will share their portion of the revenue to bring up to the proforma amount."



4914-8788-2307, v. 1

58.    In response to the question "Have you been hitting your projections," Debtor stated in promotional materials "[w]e have paid distributions in full and on time in all funds since we got involved in the business back in 2012."

59.    In reliance on Debtor's representations about the ATM investments, the Funds entered into MSAs with Paramount and invested over seven hundred million dollars.

**B.    The MSAs and Breach of the MSAs**

60.    Each of the Funds entered into an MSA with Paramount.

61.    Under each of the MSAs, the Funds purchased ATMs.

62.    The investors in the Funds, which total over 2700, invested hundreds of millions of dollars to purchase ATMs from Paramount under the MSAs.

63.    Bills of sale covering years 2017-2023 provided by Debtor, through Paramount, to the Funds showed the purchase of approximately 36,000 ATMs on the Funds' behalf; yet, many of the bills of sale contained so-called placeholder numbers, which could not be tied to any particular ATM (the placeholder number was not the actual serial number of any ATM).

64.    Moreover, upon information and belief, the bills of sale provided by Debtor for purchases in 2023 did not reflect sufficient ATMs purchased based on the amount invested by the Funds; hence, the bills of sale underreported the ATMs that should have been purchased with the Funds' investments.

65.    Furthermore, Debtor never supplied bills of sale for ATMs purchased in 2024, which should have shown several hundred additional ATMs.

66.    In total, from 2017 to 2024, Debtor, through Paramount, should have purchased in excess of 38,000 ATMs.

67.    Debtor never purchased sufficient ATMs to cover the investments made by the Funds; his failure to do so was willful, malicious and done with intent to defraud the Funds.



68.     Following purchase of the ATMs, the ATMs belonged to the respective Funds or their members.

69.     Under the MSAs, Debtor, through Paramount, agreed to provide management services for the Funds' ATMs including, among other things, placing the ATMs at retail locations, entering location contracts, and operating and maintaining the ATMs for the benefit of the Funds.

70.     Paramount and the individual Funds agreed that Paramount would remit monthly a sum to the Funds—called the Monthly Revenue Remittance—and Paramount would keep, as a fee, certain revenues generated from the operation of the ATMs.

71.     While Paramount was timely issuing payment to the Funds under the MSAs, Debtor provided updates on the Funds' investment.

72.     During a presentation in March 2023, for example, Debtor again represented the viability of the ATMs in the Funds' portfolios and projected investments.

73.     Further, in February 2024, Debtor represented that 34,000 ATMs belonging to the Funds were active and online, generating gross revenue in excess of $43 million.

74.     That representation, at the time it was made by Debtor, was not true and he knew it not to be true.

75.     In April 2024, Debtor, through Paramount, stopped issuing the Monthly Revenue Remittance to the Funds and never again resumed those payments.

76.     Upon information and belief, Debtor at some point started using new investments to pay prior monthly obligations; i.e., he was running a classic Ponzi scheme.



4914-8788-2307, v. 1

### C.      Paramount Action and Consent Judgment

77.      After repeated unanswered demands on Debtor and Paramount for the unpaid Monthly Revenue Remittance under the MSAs, the Funds filed the Paramount Action for breach of contract and injunctive relief.

78.      The Funds immediately sought a preliminary injunction, which was denied based on Debtor's testimony about the viability of the Funds' investments.

79.      Debtor's testimony at the August 26, 2024 hearing included a number of knowingly false statements, intended to further avoid discovery of the fraudulent scheme he was perpetrating.

80.      For example, when asked "how many [ATMs] today do you estimate are managed by Paramount?," Debtor answered, "Somewhere south of – somewhere between 25- and 30,000." He doubled down on that testimony later, when asked, "So presently, fair to say that Paramount manages around 35,000 ATMs for everybody?," and Debtor answered, "No. I will say the totality is probably somewhere around 30,000, between 25 and 30,000, yeah."

81.      Paramount's own internal documents show the most ATMs that Paramount **ever managed** in its history were only 17,266, which was in August of 2023, and at the time of the hearing, August of 2024, the number of managed ATMs was slightly less, at only 16,895.

82.      In other words, Debtor told the Lancaster Court, under oath, that Paramount was actively managing somewhere between 8000 and 13,000 more ATMs than it had ever managed at any point in the company's history; his overstatement of ATMs covered up between $150 million and $270 million in missing Fund investments.

83.      Debtor further knowingly falsely testified about the then-operating viability of the Funds' ATM network. He was asked, "Now, as I read the answer [to the complaint], you pled



that the ATM network of 25- or 30,000 ATMs, however many there are for the funds, is operating normally? Is that a yes?" Debtor answered, "Yeah. I mean, yes."

84.     In reality, at the time of Debtor's testimony, the ATM network was in financial shambles and he knew it. According to a July 2024 Financial Statement generated by Paramount itself, the company started running net **operating** losses in **March** of 2024—months before the injunction hearing—and ran net operating losses every month through July 2024, the month prior to the hearing. In fact, for the period of January 2024 through July 2024 alone, Paramount was already at $4 million in **operating** losses on the year, meaning the ATMs business was in substantial debt, which debt was entirely separate and apart from the **investment** debts Paramount owed to the Funds, which had totaled over $80 million through August 2024.

85.     Moreover, at the time of his testimony in August, Debtor knew he had relied on multiple loans from multiple lenders, which he unilaterally took out, to prop up the failing Ponzi scheme that he had orchestrated.

86.     Debtor also knew he had induced new investments in unrelated Bitcoin operations to continue to receive money for Paramount solely to obfuscate the fraud scheme he created.

87.     Debtor's testimony that Paramount was operating normally was intended to avoid discovery of his fraudulent scheme.

88.     Another significant, purposeful misrepresentation by Debtor at the August 2024 injunction hearing was to provide a misdirection on why Paramount wasn't paying the Funds: he grossly overstated the costs of so-called TR-31 upgrades.

89.     TR-31 is, essentially, a secure way an ATM can communicate with financial networks.



4914-8788-2307, v. 1

90.    Debtor testified at the August 2024 hearing, under oath, when asked why payments hadn't been made to the Funds for April through July, as follows: "There's a significant allocation that's going to TR-31, which is the compliance issue, a year end that we have to have in place or it will create irreparable harm to the company." He then supplied an estimate for the allocation: "we feel that upgrade easily could be $75 million."

91.    That $75 million representation was knowingly false. Paramount's CEO sent a text message to Debtor on April 28, 2024—months before the hearing—estimating the total cost of TR-31 compliance to be $11-12 million. The CEO later testified at a deposition that Paramount's internal budget for TR-31 upgrades was $12-13 million and that the company spent less than $10 million performing any upgrades.

92.    Debtor also made various representations about the financial condition of Paramount at the August hearing, testimony that is presently under seal, that were likewise knowingly false.

93.    The above misrepresentations by Debtor were intended to, and did, shield discovery of his fraud; indeed, the trial court, in denying the injunction request, wrote, "Daryl Heller … credibly testified to the financial position of defendant such that the court is not convinced the enterprise is in need of a court-supervised manager."

94.    After the injunction hearing, the Funds and Paramount later began negotiations to settle the dispute.

95.    The parties negotiated a potential resolution of the Paramount Action in November 2024, under which Heller valued the Funds' ATM network at no less than $450,000,000, and represented and/or implied that the network had over 28,000 ATMs, which he knew not to be true and time.



4914-8788-2307, v. 1

96.     On November 21, 2024, the Court in the Paramount Action entered a Consent Judgment in the Funds' favor in the amount of $138,156.118.38.

97.     The Consent Judgment further ordered that, within 2 days, Paramount shall (1) supply to the Funds a complete inventory of all ATM Units purchased by the Funds, and (2) assign and transfer to the Funds the right, title, and interest to the Funds' ATM Units and the location agreements, permits, and other agreements for the ATM units.

98.     Debtor and Paramount did not timely comply with the Consent Order.

**D.      Contempt in the Paramount Action and Discovery of Fraud Scheme**

99.     When Paramount did not comply with its obligations to provide the required information for the Funds to take title to the ATMs in the network, the Funds sought contempt, at which time they discovered Debtor's fraud.

100.    For example, through contempt proceedings, the Funds learned that they never owned 38,000 ATMs, and that Paramount never managed anywhere close to that quantity of ATMs at any time.

101.    Paramount's then-Vice President of Information Systems testified on December 6, 2024 in a Paramount Action contempt hearing that Paramount only managed between 9,000 and 10,000 ATMs total at that time, not all of which belonged to the Funds.

102.    The contempt proceedings also revealed that after the Funds filed suit against Paramount, Debtor, without consent or notice, sold off massive portions of the Funds' ATM network; specifically, the so-called PhonCo portfolio and the Cypress Advantage portfolio.

103.    It was also revealed that even before December 2024, of the approximately 20,000 ATMs that Paramount managed at the height of its management, only 8,000 of the ATMs were so-called Paramount-owned, meaning the greatest number of ATMs the Funds ever owned was a mere 8,000 ATMs, despite Debtor accepting sums sufficient to purchase in excess of



4914-8788-2307, v. 1

38,000 ATMs and despite Debtor representing that no less than 34,000 ATMs were online and active as late as February 2024.

104.    The balance of the ATMs under management by Paramount showed yet more intentional misrepresentations by Debtor to the Funds. Of the 20,000 ATMs under management at the height of Paramount's management, some 12,000 ATMs were so-called affiliated ATMs, meaning Debtor had not bought the ATMs outright, as he said he would under the MSAs, but he purchased some rights in some ATMs, but not the actual right to own the device and fully control its use and profits.

105.    Essentially, Debtor, upon information and belief, purchased partial rights in thousands of ATMs solely so he could pad the number of ATMs under management by Paramount, doing so to further his fraudulent scheme to induce Fund investments.

106.    Because the Funds did not own all of the ATMs Paramount managed, Debtor's representation that the Funds owned over 30,000 ATMs was never true.

107.    Moreover, even after the contempt proceedings, Debtor refused to identify specifically any Bitcoin devices owned by the Funds, even though approximately 150 such devices were paid for by the Funds.

108.    Furthermore, as Paramount eventually turned over information for rights and title to the Funds' ATMs, the Funds learned that Debtor orchestrated the purchase of ATMs that he never even intended to place in locations for operation.

109.    For example, in 2020 through 2023, Debtor entered into sales agreements with TriData U.S., Inc. for the purchase of used ATM units for the Funds.

110.    Upon present information and belief, Debtor purchased in excess of 4,000 ATMs from Tri-Data using Fund money.



4914-8788-2307, v. 1

111.    For some purchase agreements with TriData, Debtor explicitly negotiated for over a year of storage for the ATM units.

112.    Nearly 3000 of the TriData-purchased ATMs never left the warehouse.

113.    Debtor purchased them knowing he would never place them into service and he purchased them solely so he could, and later did, represent to the Funds that he was complying with his obligations under the investment scheme.

114.    In sum, Debtor purchased in excess of 4,000 ATMs from TriData and no less than approximately 3000 of those ATMs never left a warehouse, all at Debtor's request, and all to further his fraudulent scheme.

115.    Rather than ensuring that the ATMs were deployed to a location to begin operation, as Debtor represented to the Funds he would, Debtor let those TriData-purchased ATMs sit valueless in storage.

116.    Upon information and belief, Debtor also did not buy all of the ATMs he represented he would.

117.    Upon information and belief, Debtor also purchased ATM units in which more than one investor group has title or interest.

118.    For example, Debtor represented to ATM investors (ones not participants in the Funds) in Michigan that he purchased 250 ATMs under an MSA, but more than half of those ATM serial numbers overlapped with serial numbers of ATMs Debtor allegedly purchased for the Funds, and some of those overlaps span across multiple Funds.

119.    Further, Debtor issued multiple bills of sale to individual Funds that reflected serial numbers already on bills of sale to other Funds, meaning he was double-selling ATM units over and over.



4914-8788-2307, v. 1

120.    Next, in discovery, the Funds learned that Debtor had taken in excess of $20 million of Funds money invested in Paramount and used that money that to purchase interests in cannabis businesses in Michigan.

121.    Lastly, the Funds discovered that Debtor left the Funds' remaining network in shambles.

122.    It was saddled with unpaid debts, totaling, upon information and belief, around $7 million.

123.    Also, the Funds learned that some of the ATMs had been pledged as collateral by Debtor for loans that he subsequently defaulted on.

124.    Indeed, the Funds found multiple UCC filings based on Debtor's, fraudulent and false representations to multiple lenders that he had the authority to pledge Fund assets.

125.    Debtor had not paid many vendors and locations for many months, resulting in thousands of ATMs being offline, replaced, and unavailable for the Funds to operate.

126.    Large portions of the network were subject to disputed ownership claims because Debtor had not paid the persons or entities from whom various portfolios were purchased by Debtor.

127.    In sum, Debtor intentionally caused the Funds' remaining assets to be of limited value.

128.    And, significantly, multiple former officers of Paramount and Heller Capital testified that the only person who made all major financial decisions at Paramount (and all Heller-related entities) was Debtor himself and that he controlled the information necessary to set up, perpetual, and hide his Ponzi scheme.



4914-8788-2307, v. 1

**E.      Heller's Conveyances to Heller Capital**

129.    Notably, after the Funds secured their Consent Judgment against Paramount on November 21, 2024, Debtor authorized various transfers of funds from Paramount's accounts to Heller Capital.

130.    In the month after the Consent Judgment was entered, Paramount received $1,320,252.82, but disbursed over $2,000,000, including significant payments to Heller Capital.

131.    Indeed, Paramount acknowledged that it transferred $344,867.62 to Heller Capital in the month after the Consent Judgment.

132.    As Paramount represented in the Paramount Action, it laid off its staff on December 13, 2024, leaving it without any employees.

133.    Therefore, any of Paramount's financial transactions after that date could only be authorized by Debtor, the CEO of Heller Capital, which is the sole member of Paramount.

134.    Debtor made these transfers after the Funds' Consent Judgment against Paramount.

135.    Upon information and belief, Heller made additional voidable transfers to Heller Capital.

**COUNT I**
**Non-Dischargeability of Debts Pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B)**

136.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

137.    Plaintiffs are each creditors of the Debtor as reflected in each of their proofs of claim filed in the Debtor's bankruptcy case.



4914-8788-2307, v. 1

138.     Debtor is indebted to each of the Funds for money obtained by false pretenses, false representations, and actual fraud.

139.     Debtor represented that he would and did purchase ATMs and BTMs that the Funds owned outright.

140.     Debtor further represented that the purchased ATMs and BTMs would be deployed by Paramount to retail locations and begin to generate fees that would ultimately result in a Monthly Revenue Remittance to the Funds and a profit on the investment.

141.     Debtor also represented that the Funds owned in excess of 30,000 ATMs.

142.     These representations were material to the Funds, who invested and maintained their investment based on Debtor's representations.

143.     But these representations were false because Debtor either (1) did not buy all the ATMs he represented he would, (2) purchased ATMs that were never deployed to locations, (3) sold ATM units in which more than one entity has title or interest, and/or (4) represented ATMs were purchased outright that were not purchased outright.

144.     Moreover, at the time that Heller made the representations, he knew they were false.

145.     The Funds reasonably relied on those representations from Heller who, as the CEO of Heller Capital, which is the majority and/or sole member of Paramount, claimed industry knowledge and successful experience in the ATM market.

146.     As a direct and proximate result of Heller's representations, the Funds suffered substantial damages.

147.     The promotional materials as well as other written materials misrepresented the financial condition of Paramount, an insider of the Debtor.



4914-8788-2307, v. 1

148.    Debtor knew or should have known that the Funds would reasonably rely on Defendant's misrepresentations and omissions including those set forth in the promotional materials.

149.    Each of the Funds in fact, reasonably relied upon Debtor's misrepresentations when investing with Debtor to their detriment and Debtor's benefit.

150.    Debtor is thus indebted to the Funds for money Defendant obtained from each of the Plaintiffs as a result of false pretenses, false representations, and actual fraud perpetrated by Debtor.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment that the debts owed by Debtor to each of the Plaintiffs are not dischargeable, as well as for any costs of suit and attorneys' fees as may be authorized by law or otherwise, and for any other relief that the Court deems just and proper.

### COUNT II
### Non-Dischargeability of Debts Pursuant to 11 U.S.C. Section 523(a)(4)
### (Embezzlement / Larceny)

151.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

152.    Debtor was entrusted with the investments of the Funds

153.    Despite this trust, Debtor, with the intent to defraud the Funds, knowingly and intentionally converted the Funds' investments for purposes other than represented.

154.    Debtor acted with the intent to permanently deprive the Funds of their investments.



4914-8788-2307, v. 1

155.    In addition, following entry of the Consent Judgment in the Paramount Action, Debtor willfully converted funds from Paramount and transferred the funds to Heller Capital.

156.    As a direct and proximate result of Defendant's embezzlement the Funds have suffered damages, collectively, exceeding $542,577,046.38.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment that the debts owed by Debtor to each of the Plaintiffs are not dischargeable, as well as for any costs of suit and attorneys' fees as may be authorized by law or otherwise, and for any other relief that the Court deems just and proper.

## COUNT III
### Non-Dischargeability of Debts Pursuant to 11 U.S.C. Section 523(a)(6)

157.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

158.    Debtor's actions were willful and malicious.

159.    Debtor's actions caused harm to the property of each of the Plaintiffs.

160.    As a direct and proximate result of Defendant's embezzlement the Funds have suffered damages, collectively, exceeding $542,577,046.38.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment that the debts owed by Debtor to each of the Plaintiffs are not dischargeable, as well as for any costs of suit and attorneys' fees as may be authorized by law or otherwise, and for any other relief that the Court deems just and proper.



4914-8788-2307, v. 1

## COUNT IV
### <u>Non-Dischargeability of Debts Pursuant to 11 U.S.C. Section 523(a)(13)</u>

161.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

162.    Upon information and belief, Debtor may be subject to criminal prosecution for his actions with regard to the Funds and otherwise.

163.    Upon information and belief, if Debtor is subject to criminal prosecution for his actions relating to the Funds, he may be required to make payment to Plaintiffs under an order of restitution issued under title 18 of the United States Code.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment that the debts owed by Debtor to each of the Plaintiffs are not dischargeable, as well as for any costs of suit and attorneys' fees as may be authorized by law or otherwise, and for any other relief that the Court deems just and proper.

### <u>CONCLUSION</u>

**WHEREFORE**, the Plaintiffs herein respectfully request that the Court enter judgment in their favor of the causes of action set forth above, and enter judgment providing, *inter alia,* that the debts detailed above, owed by Debtor to each of the Plaintiffs, are non-dischargeable in the Debtor's pending chapter 11 case.

Respectfully submitted,

**STARK & STARK**
A Professional Corporation

By:     <u>/s/ *Marshall T. Kizner*</u>
        MARSHALL T. KIZNER, ESQ.

By:     <u>/s/ *Joseph H. Lemkin*</u>
        JOSEPH H. LEMKIN, ESQ.
        100 American Metro Blvd.



4914-8788-2307, v. 1

Hamilton, NJ 08619
(609) 791-7922 (direct)
(609) 896-9060 (main)
(609) 895-7395 (facsimile)

-and-

**SAXTON & STUMP LLC**
JOSHUA VOSS, ESQ.
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
(717) 556-1072 (direct)
(717) 441-3810 (facsimile

Attorneys for Prestige Fund A, LLC, Prestige Fund A IV, LLC,
Prestige Fund A IX, LLC, Prestige Fund B, LLC, Prestige Fund
B II, LLC, Prestige Fund B IV, LLC, Prestige Fund B V, LLC,
Prestige Fund B VI, LLC, Prestige Fund B VII, LLC, Prestige
Fund B BTM I, LLC, Prestige Fund A II, LLC, Prestige Fund A
V, LLC, Prestige Fund A VI, LLC, Prestige Fund A VII, LLC,
Prestige Fund D, LLC, Prestige Fund D III, LLC, Prestige Fund
D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC,
Prestige Fund D BTM I, LLC, WF Velocity I, LLC, WF Velocity
Fund IV, LLC, WF Velocity Fund V, LLC, WF Velocity Fund
VI, LLC and WF Velocity Fund VII, LLC

Dated:  May 15, 2025

